1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

BILLY D. FOWLER,

          Petitioner,

    v.

MAGGIE MILLER-STOUT,

          Respondent.

Case No. C06-5620FDB

REPORT AND
RECOMMENDATION

**NOTED FOR:**
**March 16, 2007**

    This 28 U.S.C. § 2254 petition for habeas corpus relief has been referred to the

undersigned Magistrate Judge pursuant to 28 U.S.C. § 636 (b) and local Rules MJR 3 and 4.

**INTRODUCTION AND DISCUSSION**

    Petitioner challenges his 2004, Clarke County convictions for two counts of second

degree burglary and two counts of first degree theft. (Dkt. # 10 page 2).  He was sentenced to

one hundred and two months.  Having reviewed the file the court concludes this is a mixed

petition and should be dismissed **WITHOUT PREJUDICE.**

REPORT AND RECOMMENDATION- 1

1

**FACTS**

2

The Washington State Court of Appeals summarized the facts as follows:

3
4
5
6

Custom Cuts, a hair salon, and Easy Pawn, a pawnshop, share a common wall in a strip mall in Vancouver, Washington.  On October 26, 2003, between 2:00 P.M. and 4:00 P.M., Jean Hudson and Norma Page arrived to clean at Custom Cuts just as they had every week for approximately two years.  Hudson would usually park in a space just in front of the windows of Custom Cuts, but on this day an aluminum extension ladder had been placed in that parking space leading up to the roof of the building.  The ladder was leaning against the building and across the window of Custom Cuts.  She parked in another parking space.

7

8
9
10
11
12

When Hudson and Page entered Custom Cuts to begin cleaning, they heard pounding on the roof.  As Hudson was sweeping near the window, she saw movement out of the corner of her eye.  She looked up as a "gentleman was coming down the ladder facing [her]." 2 Report of Proceedings (RP) at 87.  He did not look up and did not look into the window at her; "[they did not] make eye contact." 2 RP at 88.  The man then got off the ladder and walked toward the door and out of Hudson's sight.  Hudson assumed that he was the owner of building doing some work on the roof.  She described the man as "gray haired" and "kinda nice looking as far as somebody that could own a building." 2 RP at 90.  When Hudson left Custom Cuts, she locked the deadbolt and the door.

13
14
15
16
17

At approximately 7:30 P.M. that evening, Robert Moline, the owner of Easy Pawn, received a telephone call from his alarm company, informing him that a perimeter and motion alarm at the pawnshop had been triggered.  Moline arrived at Easy Pawn within 10 minutes of receiving the call.  Moline went through the front door and walked through the center aisle to the back of the shop.  He checked the area where the perimeter and motion alarm had sounded and checked the back door.  Not seeing anything out of the ordinary in these areas, Moline assumed that it was a false alarm, so he locked the door, set the alarm, and left.

18
19
20
21
22
23
24

The next morning, Jason Matilla, an employee at Easy Pawn, discovered that jewelry had been taken from a showcase in Easy Pawn.  He called the sheriff's office.  Deputy Kevin McVicker responded.  Matilla showed Deputy McVicker a small hole in the wall at the back of the shop.  Deputy McVicker determined that Easy Pawn had been entered through a hole in the wall that separated Easy Pawn from Custom Cuts.  Deputy McVicker then went around the outside of the building to check the exterior windows of Custom Cuts.  Looking through the window, Deputy McVicker saw a hole had been cut into the roof over Custom Cuts.  Deputy McVicker found a broken Sawzall Blade next to the hole in the roof.  McVicker also noted that some dirt on top of the roof had been disrupted, but he found no discernable footprints or shoe patterns.  An inventory taken that night revealed that jewelry with an approximate value of $26,000 had been taken from Easy Pawn.

25
26
27

Matilla contacted Carol Baker, the owner of Custom Cuts, to inform her of the burglary.  Baker noticed that the drawers of her salon had been rifled through.  When Deputy McVicker finished his investigation and left Custom Cuts, Baker called Hudson and Page to ask them to clean the salon again.  Hudson and Page told Baker that they saw someone at the salon the previous day coming down a ladder from the roof.  Baker called Deputy McVicker to tell him what Hudson and

28

REPORT AND RECOMMENDATION- 2

1   Page told her.  While they were cleaning they discovered a used cigarette on the
bathroom floor.  They told Baker that the cigarette had not been there when they

2   left the day before.  Deputy McVicker returned to Custom Cuts to collect the
Basic Brand cigarette that was found during cleanup.  An inventory of Custom

3   Cuts revealed that shears, a scissors case, clippers, jewelry, and a sculpture with a
combined value of approximately $3,000 were missing from the salon.

4

5   Deputy James Naramore of the Clark County Sheriff's office contacted
Fowler on November 8, 2003.  During the contact, Fowler was near a 1997 Ford

6   pickup truck.  Deputy Naramore described the color of the truck as "a light
turquoise, what somebody could construe as a blue-green color, very light," and

7   went on to say that "[i]t's a 1997, so it's a newer model Ford pickup." 2 RP at
145.  Deputy Naramore determined that Fowler was the registered owner of the

8   truck.  He also reported that he saw in the truck an open and unopened pack of
Basic Brand cigarettes, a Sawzall, an extension ladder, and used Sawzall blades.

9   On January 14, 2004, Detective Charles Kerr of the Clark County Sheriff's
Office asked Hudson and Page to look at a photographic montage.  Hudson

10  quickly identified Fowler as the man she saw at Custom Cuts, stating, "That's the
one." 2 RP at 94.  At trial, when presented with the montage, Hudson stated that

11  she could not be sure, but she thought that it was the same set of photographs that
were shown to her at her home.  Page was unable to identify anyone from the

12  montage.

13  On February 4, 2004, the State charged Fowler with second degree
burglary and first degree theft of Easy Pawn and second degree burglary and first

14  degree theft of Custom Cuts.  Hudson, Page, Matilla, Baker, Deputy McVicker,
Deputy Naramore, and Detective Kerr testified as described above.

15

16  Deputy McVicker also testified that Hudson had described the man
she saw coming down the ladder as being between thirty and forty
years old, business type looking.  He had short graying hair, which

17  was neatly trimmed and dressed in casual clothes.

18  She said that he seemed to be somewhat tall, but had a slight build.

19  2RP at 59

20  When the State asked if he had spoken with Page, Deputy McVicker stated:

21  Yes.  She– she didn't think that she could give me any additional
information from what her daughter had given me, although when asked if they

22  had seen any vehicles parked in the area, Mrs. Page was the one that told me that
she had noticed a blue, neat, normal-sized, she described it as normal-sized pickup

23  parked it would be north side of the salon near Vancouver Glass.

24  2 RP at 59-60.  He testified that Page did not indicate if the truck was new or old.

25  Page testified that she recalled seeing a newer, small, light blue pickup
truck parked around the corner from Custom Cuts in front of the glass shop.  On

26  cross-examination, Fowler's trial counsel asked Page if the truck was "robin-egg
blue," and she responded that it was "[j]ust a real pretty light blue, yes." 2 RP at

27  109.  She could not remember telling Deputy McVicker about the truck, but

28  REPORT AND RECOMMENDATION- 3

1
2

thought that she could have.  She also stated she thought the person she saw on the roof of Custom Cuts was a "younger person."  2 RP at 109.

3
4

The jury found Fowler guilty on all counts.  After finding that Fowler had an offender score of 24, the trial court imposed an exceptional sentence of two consecutive 51-month sentences, finding Fowler should not receive the "benefit of any free crimes as his offender score is greater than 9 on the multiple offenses." Clerk's Papers (CP) at 122.

5

(Dkt. # 11, exhibit 3, pages 2 to 5).

6

## **PROCEDURAL HISTORY**

7

Petitioner filed a direct appeal and argued:

8
9
10
11

1.    The trial court denied the defendant his right to due process under Washington Constitution, Article 1, § 3, and under United States Constitution, Fourteenth Amendment, When it entered judgments against him for two counts of second degree burglary and two counts of first degree theft because the state failed to present substantial evidence on these charges.

12
13
14

2.    Trial counsel's failure to object to the presentation of inadmissible hearsay, inadmissible opinion evidence and inadmissible evidence that the defendant had committed other crimes denied the defendant his right to effective assistance of counsel under Washington State Constitution, Article 1 § 22 and United States Constitution, Sixth Amendment.

15
16
17

3.    The trial court erred when it imposed an exceptional sentence based upon its incorrect belief that the defendant's offender score was 24 points because the state failed to prove the defendants prior convictions.

18

(Dkt. # 11, exhibit 4 pages ii and iii).  In a Statement of Additional grounds petitioner raised the

19

following issues:

20

1.    Ineffective assistance of counsel for failing to suppress the photo montage.

21
22

2.    The police erred when they failed to preserve a video tape of the jewelry store crime.

23

(Dkt. # 11, exhibit 5).  The Washington State Court of Appeals upheld the convictions, but

24

remanded for re-sentencing (Dkt. # 11, exhibit 3).

25

Petitioner filed a motion for discretionary review regarding the conviction and argued:

26

1.    Did the Court of Appeals, Chief Judge err by not applying the Harmless-Error Analysis during their earlier review?

27

28

REPORT AND RECOMMENDATION- 4

2.      Did the Court of Appeals over exaggerate the actual facts in this
        case when it applied the Sufficiency of Evidence test?

3.      Did a **Brady** violation occur?

(Dkt. # 11, exhibit 8).  Petitioner argues his first issue in terms of a Fourteenth Amendment due

process violation as there was a lack of evidence (Dkt. # 11, exhibit 8).  Review was denied

September 6, 2006 (Dkt. #11, exhibit 9).

Petitioner filed the federal petition now before the court and agues:

1.      Failure to preserve evidence: The trial court violated the
        Petitioner's rights under the Sixth and Fourteenth Amendments
        when it denied his motion for continuance to review a surveillance
        videotape to determine if it had exculpatory value.

2.      Insufficient evidence: The trial court violated the Petitioner's rights
        under the Sixth and Fourteenth Amendments when it entered
        judgments against the Petitioner for two counts of second degree
        burglary and two counts of first degree theft, where the state failed
        to present substantial evidence on these charges.

3.      Defective identification procedure: The trial court violated the
        Petitioner's rights under the Fourth and Fourteenth Amendments
        when it denied his motion to suppress the evidence.

4.      Ineffective Assistance: The Petitioner's rights under the Sixth and
        Fourteenth Amendments were violated by ineffective assistance at
        trial, where counsel failed to object throughout the entire trial.

(Dkt. # 1).

Respondent has filed an answer and argues the first two grounds, relating to sufficiency of

the evidence and failure to preserve the video tape, have been exhausted, but, the last two

grounds have not been properly exhausted (Dkt. # 10).  Respondent briefs the first two claims on

the merits, and asks for dismissal with prejudice.  In the alternative, respondent asks petitioner be

given his "options" regarding a mixed petition (Dkt. # 10).

**DISCUSSION**

A.      Exhaustion of State Remedies.

Federal Habeas Corpus petitions are subject to an exhaustion requirement.  In order to

satisfy the exhaustion requirement, petitioner's claims must have been fairly presented to the

state's highest court.  Picard v. Connor, 404 U.S. 270, 276 (1971); Middleton v. Cupp, 768 F.2d

REPORT AND RECOMMENDATION- 5

1   1083, 1086 (9th Cir. 1985).  A federal habeas petitioner must provide the state courts with a fair

2   opportunity to correct alleged violations of prisoners' federal rights.  Duncan v. Henry, 513

3   U.S.364, 115 S.Ct. 887, 888 (1995).  It is not enough that all the facts necessary to support the

4   federal claim were before the state courts or that a somewhat similar state law claim was made.

5   Id, *citing* Picard v. Connor, 404 U.S. 270 (1971) and Anderson v. Harless, 459 U.S. 4 (1982).  A

6   federal court faced with an unexhausted petition dismisses the petition, without prejudice, so that

7   the petitioner has an opportunity to exhaust the claims in state court.  Rose v, Lundy, 455 U.S.

8   509, 522 (1982).

9       Contrary to petitioners reply, (Dkt. # 14), Petitioner did not clearly place his third and

10  fourth grounds for relief before both the Washington State Court of Appeals and the Washington

11  State Supreme Court.  This is a mixed petition.

12      The one year time frame for filing a habeas petition did not start to run until September 6,

13  2006 when the direct appeal process was completed (Dkt. # 11, exhibit 9).  Thus, the one year

14  that petitioner has to file a federal habeas challenge has not yet run.  Petitioner has the ability to

15  raise and exhaust his issues in a Personal Restraint Petition.  Petitioner should be given that

16  opportunity.

17      Counsel asks the court to advise petitioner as to his options (Dkt. # 10).  The court does

18  not advise petitioner of the consequences of returning to state court to exhaust his unexhausted

19  claims.  Pliler v Ford, 542 U.S. 225 (2004).  If petitioner chooses he may dismiss the two

20  unexhausted claims and proceed on his two remaining claims.  Jefferson v Budge, 419 F.3d 1013

21  (9th Cir. 2005).  To dismiss the unexhausted claims petitioner would need to file a motion

22  abandoning those two claims.  As it stands now, this is a mixed petition.

23                                          CONCLUSION

24      Based on the foregoing discussion, the Court should **DISMISS** the petition **WITHOUT**

25  **PREJUDICE.**  A proposed order accompanies this report and recommendation.

26      Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal rules of Civil Procedure,

27  the parties shall have ten (10) days from service of this Report to file written objections.  *See also*

28  REPORT AND RECOMMENDATION- 6

1   Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those objections for purposes

2   of appeal.  Thomas v. Arn, 474 U.S. 140 (1985).  Accommodating the time limit imposed by Rule

3   72(b), the clerk is directed to set the matter for consideration on **March 16, 2007** as noted in the

4   caption.

5        Dated this 14 day of February, 2007.

6

7                  /S/ *J. Kelley Arnold*
               J. Kelley Arnold
               United States Magistrate Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28   REPORT AND RECOMMENDATION- 7